| | | |
|---|---|---|
| **CT HEALTHCARE HOLDINGS, LLC,** | § | **UNITED STATES DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | **WESTERN DISTRICT OF TEXAS** |
| | § | |
| **v.** | § | |
| | § | **AUSTIN DIVISION** |
| **ROBERT SEK and TOTAL MD, LLC,** | § | |
| | § | **CIVIL ACTION NO. ________** |
| **Defendants.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND REQUEST FOR APPOINTMENT OF RECEIVER**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff CT Healthcare Holdings, LLC ("CT Healthcare") files this Original Complaint against Robert Sek ("Sek") and Total MD, LLC ("Total MD"). CT Healthcare also moves for appointment of a receiver under Federal Rule of Civil Procedure 66. CT Healthcare alleges as follows:

## I. NATURE OF THE ACTION

1. This case arises from the sale of an eight-percent ownership interest in Total MD for approximately $4 million, the representations Sek made to induce that investment, Defendants' later failure to honor a written mediated buyback agreement, and Sek's continuing control over Total MD's money, records, and financial reporting.

2. Sek personally solicited the investment. On August 30, 2024, he led a Zoom presentation to Chirag Patel and Twinkle Patel, acting for CT Healthcare. He presented Total MD's business, growth plan, and value. He represented that Total MD was worth at least $100 million. He displayed documents that he described as written $100 million offers for the

company, rejected those offers in front of the Patels, tore them up, and stated that Total MD was actually worth approximately $200 million.

3. Sek also represented how CT Healthcare's money would be used. He represented that the investment would help rebrand Total Men's locations as Total Healthcare, fund social-media and Google marketing, open additional locations including outside Texas, and reduce Total MD's approximately $15 million Alignment Credit debt. Those representations concerned the reason CT Healthcare was being asked to supply capital and the enterprise from which CT Healthcare expected its investment return.

4. CT Healthcare relied on Sek's representations. The parties negotiated an entry valuation of $50 million so that CT Healthcare's $4 million investment would purchase an eight-percent interest. CT Healthcare then funded the investment in two closings, approximately $2 million near the end of September 2024 and approximately $2 million on November 1, 2024.

5. The promised growth and use of proceeds did not occur. Total MD did not rebrand its locations as represented. It did not undertake the represented expansion. It did not use the investment as represented to reduce the Alignment Credit debt. Instead, that debt increased from approximately $15 million to approximately $17 million. After the investment closed, Sek also refused to implement the represented ImmuGlow expansion through Total MD's clinics and later displaced ImmuGlow with another arrangement.

6. CT Healthcare further alleges that the valuation and offer representations were materially false or misleading when made. Sek did not have the bona fide $100 million offers he represented to CT Healthcare, and the documents he displayed did not substantiate a bona fide market valuation of Total MD at $100 million or $200 million. Sek possessed superior knowledge of Total MD's actual finances, secured debt, liabilities, cash flow, and internal reporting. He controlled the company and its financial information.

7. The later conduct is consistent with, and corroborates, CT Healthcare's allegation that Sek never intended to use the investment proceeds in the manner he represented. Every principal represented use of proceeds failed. The company's debt moved in the opposite direction. Sek immediately exercised unilateral control over business opportunities that had been part of the investment pitch. He then denied CT Healthcare meaningful, retainable access to the financial information needed to trace the investment and evaluate the company's condition.

8. CT Healthcare asserts claims under section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. It also asserts controlling-person liability under section 20(a). In addition, CT Healthcare asserts statutory seller and controlling-person liability under the Texas Securities Act, now codified in Chapter 4008 of the Texas Government Code.

9. CT Healthcare separately seeks to enforce the December 2025 Mediated Settlement Agreement ("MSA"). Under the MSA, Sek agreed to purchase CT Healthcare's eight-percent interest through structured payments and personally guaranteed all payment obligations contained in the agreement. Defendants did not make the required payments. CT Healthcare therefore remains an eight-percent member of Total MD and continues to hold that equity as security for the unpaid settlement consideration.

10. CT Healthcare pleads its securities remedies, MSA remedies, fiduciary remedies, and equitable remedies in the alternative under Federal Rule of Civil Procedure 8(d). It does not seek a double recovery. If CT Healthcare obtains rescission under the Texas Securities Act, it will tender the security as required by law. If CT Healthcare instead enforces the MSA buyback, any securities-law recovery will be adjusted to avoid duplicative compensation.

## II. PARTIES

11. Plaintiff CT Healthcare Holdings, LLC is a Texas limited liability company. It purchased Class A Units of Total MD and acquired an eight-percent membership interest for approximately $4 million.

12. Defendant Total MD, LLC is a Texas limited liability company. Total MD issued and sold the Class A Units to CT Healthcare. Total MD maintains its headquarters and business address at 8300 North Lamar Boulevard, Suite 200A, Austin, Texas 78753, and serves as the management company for physician-practice operations. Total MD's public filing identifies "TOTALMD" as its registered agent at that address, as further addressed below.

13. Defendant Robert Sek is an individual who resides in Puerto Rico and maintains substantial business contacts with Texas. At all material times, Sek was Total MD's chief executive, sole manager or controlling manager, and principal decision-maker. Total MD's Company Agreement identifies Sek as its sole manager as of January 19, 2023. Public information reports identify him as a manager. Exhibit 6, § 3.01; Exhibit 12. He may be served at 11 Calle Taft, Apartment 1, San Juan, Puerto Rico 00911; or at 1500 Anise Drive, Austin, Texas 78741; or wherever he may be found.

14. Sek personally made the material investment representations alleged in this Complaint. He led the August 30, 2024 Zoom presentation, negotiated the investment, communicated the deal terms, signed Total MD's investment documents, controlled the use of Total MD's funds, and later signed the MSA individually and for Total MD.

15. Total MD's public filing identifies its registered agent as "TOTALMD" at 8300 North Lamar Boulevard, Suite 200A, Austin, Texas 78753. CT Healthcare's searches have disclosed no Texas entity registered under that name and no assumed-name filing for "TOTALMD" in the Texas Secretary of State or Travis County records. Texas law does not permit a filing entity to serve as its own registered agent. Tex. Bus. Orgs. Code § 5.201(b)(2)(B). If Total MD has failed to appoint or maintain a legally sufficient registered agent, or if its registered agent cannot with reasonable diligence be found at the registered office, service may be made through the Texas Secretary of State as provided by Tex. Bus. Orgs. Code § 5.251.

16. Plaintiff will also transmit requests for waiver or acceptance of service and courtesy copies of the summons and Complaint to Edward F. Fernandes and Christopher H. Taylor of King & Spalding LLP, counsel who represented the Total MD parties in connection with the underlying litigation and mediation, at 500 West Second Street, Suite 1800, Austin, Texas 78701, and at efernandes@kslaw.com and ctaylor@kslaw.com. Delivery to counsel will constitute service only if counsel confirms that they are authorized to accept service or Defendants execute waivers under Federal Rule of Civil Procedure 4(d).

**III. JURISDICTION AND VENUE**

17. This Court has exclusive subject-matter jurisdiction over CT Healthcare's claims under section 10(b), Rule 10b-5, and section 20(a) under 15 U.S.C. § 78aa(a) and 28 U.S.C. § 1331.

18. This Court has supplemental jurisdiction over the related Texas claims under 28 U.S.C. § 1367(a). Those claims form part of the same case or controversy because they arise from CT Healthcare's purchase and continuing ownership of Total MD securities, Sek's management and representations, the parties' MSA concerning the same eight-percent interest, and the financial conduct that affects the value and security of that investment.

19. The Court may grant declaratory relief under 28 U.S.C. §§ 2201–2202 and equitable relief under Federal Rules of Civil Procedure 65 and 66.

20. Venue is proper in the Western District of Texas under 15 U.S.C. § 78aa(a). Total MD maintains its headquarters and business address in Austin and transacts business in this District. After the August 30, 2024 Zoom presentation, Sek met with Chirag Patel and Twinkle Patel at Total MD's Austin headquarters, where Sek continued the investment solicitation and negotiated CT Healthcare's entry valuation, capital contribution, percentage ownership, and proposed participation in Total MD's growth opportunities. Section 78aa(a) authorizes suit in a

district where an act or transaction constituting the alleged violation occurred or where a defendant is found, is an inhabitant, or transacts business.

21. Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to CT Healthcare's claims occurred in this District. The parties conducted material investment negotiations at Total MD's Austin headquarters. During those negotiations, Sek acted for Total MD and negotiated the valuation and transaction structure under which CT Healthcare would contribute approximately $4 million in exchange for an eight-percent interest in Total MD. Total MD subsequently issued the Class A Units while maintaining its headquarters and business operations in this District. Sek also directed Total MD's management, financial reporting, and performance of its obligations to CT Healthcare from Austin.

22. Section 78aa(a) authorizes nationwide service of process. When Congress provides nationwide service, the Fifth Amendment due-process inquiry considers a defendant's contacts with the United States as a whole. Busch v. Buchman, Buchman & O'Brien, Law Firm, 11 F.3d 1255, 1257–58 (5th Cir. 1994). Sek resides in Puerto Rico, a territory of the United States, and personally conducted substantial business activities in Austin, including the material investment negotiations alleged in this Complaint. Total MD is a Texas limited liability company that maintains its headquarters and business address in Austin. Personal jurisdiction is proper.

## IV. EXHIBITS

23. CT Healthcare attaches the following exhibits in support of the allegations in this Complaint. These exhibits may also be cited in CT Healthcare's separately filed application for temporary and preliminary injunctive relief:

Exhibit 1. Declaration of Twinkle Patel.

Exhibit 2. Declaration of John Peskuski.

Exhibit 3. Administrative Services Agreement.

Exhibit 4. Subscription Agreement.

Exhibit 5. Joinder Agreement.

Exhibit 6. Total MD Third Amended and Restated Company Agreement.

Exhibit 7. Amendment to Subscription Agreement.

Exhibit 8. Mediated Settlement Agreement.

Exhibit 9. Text messages concerning financial information.

Exhibit 10. IRS tax lien.

Exhibit 11. UCC filings.

Exhibit 12. Total Md, LLC Texas Comptroller Account Status Record.

Exhibit 13. Declaration of Chirag Patel with the redacted February 17 and 20 email chain.

Exhibit 14. May 23, 2025, confidential-mode email and Twinkle Patel's request for downloadable reports.

Exhibit 15. March 28, 2026, access-denial recording.

24. CT Healthcare may supplement the evidentiary record with additional nonprivileged declarations and contemporaneous communications as permitted by the Court.

## V. FACTUAL ALLEGATIONS

### A. Total MD's Management Structure and Sek's Control

25. Total MD provides non-medical management and operational services to physician practices. Total MD Physicians Group, PLLC ("TMPG") is a Texas professional limited liability company that provides medical services.

26. On January 21, 2021, Total MD and TMPG entered an Administrative Services Agreement. Exhibit 3. That agreement appointed Total MD as TMPG's sole and exclusive agent

for day-to-day management of TMPG's non-medical business affairs. It gave Total MD authority over accounting systems, financial records, billing, collections, accounts payable, payroll support, contracting, and other business functions. Exhibit 3, §§ 3.8–3.10, 5.2–5.4.

27. The Administrative Services Agreement created a controlled cash-management structure. TMPG was to deposit revenue into a depository account. Exhibit 3, § 5.3(a). Those revenues were then swept into an operating account jointly controlled by TMPG and Total MD. *Id*. § 5.3(b). Total MD was to disburse the funds in a specified order for practice expenses, manager expenses, management fees, revolving-credit obligations, and any remaining balance. Id. § 5.3(c)(i)–(v).

28. The agreement prohibited use or transfer of depository or operating-account funds contrary to the agreement. Exhibit 3, § 5.3(d). It also required a $250,000 reserve before owner distributions. *Id*. § 5.4.

29. This structure gave Total MD access to significant financial information concerning TMPG revenue, billing, collections, and transfers. Sek controlled Total MD. He therefore occupied a position from which he knew, or had ready access to, information concerning Total MD's actual cash flow, secured debt, liabilities, management fees, related-party payments, and the financial condition of the enterprise that CT Healthcare was being asked to invest in.

**B. The Investment Solicitation Begins**

30. In July 2024, Chirag Patel and Twinkle Patel attended a physicians' conference in New York. Through an introduction, they met Wasi Khan. Khan was then Total MD's Director of Operations for the Houston region and behavioral-health operations.

31. Khan told the Patels that Total MD was looking for a laboratory relationship and wanted to develop an in-house physician-office-laboratory model. CT Healthcare would provide

investment capital. The Patels and affiliated businesses would also contribute laboratory experience and operating capabilities through separate arrangements.

32. Khan arranged a presentation with Sek. The presentation occurred by Zoom on August 30, 2024. On Total MD's side, Sek, Khan, and Rikin Shah participated. Chirag Patel and Twinkle Patel participated for CT Healthcare. Sek did most of the talking and presented Total MD's investment pitch.

**C. Sek's August 30, 2024 Valuation and Offer Representations**

33. During the August 30 Zoom presentation, Sek represented that Total MD was then worth approximately $100 million. The representation concerned Total MD's existing value, not merely a hoped-for future value.

34. Sek reinforced that valuation representation with what he described as market evidence. He displayed documents to the Patels and represented that they were written offers to purchase or value Total MD at approximately $100 million.

35. Sek then tore up or discarded the displayed papers in front of the Patels. He represented that he received offers of that kind and was rejecting them because Total MD was really worth approximately $200 million or substantially more than $100 million.

36. Those statements were material. CT Healthcare was deciding whether to invest $4 million in a private company for a minority interest. The company's existing value, the existence of bona fide third-party offers, and the relationship between the represented market value and CT Healthcare's entry price were facts a reasonable investor would consider important. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

37. CT Healthcare alleges that Sek's representations were false or materially misleading. Sek did not possess bona fide written $100 million offers supporting the market-value story he presented. The papers he displayed did not establish bona fide third-party willingness to purchase Total MD at the values Sek represented. Sek nevertheless used the

supposed offers to create the impression that CT Healthcare was receiving an unusually favorable entry price into a company already worth two to four times the negotiated entry valuation.

38. Sek was the maker of these statements. He personally spoke them and exercised ultimate authority over their content and communication. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). He made them while acting for Total MD and while soliciting CT Healthcare's purchase of Total MD securities.

**D. Sek's Representations About Growth and Use of CT Healthcare's $4 Million**

39. Sek also described what Total MD would do with CT Healthcare's investment and how those actions would grow the value of the enterprise.

40. Sek represented that Total MD would rebrand Total Men's locations as Total Healthcare within approximately one year. The rebranding would broaden the patient base beyond men's health and would be supported by social-media and Google marketing.

41. Sek represented that Total MD would add locations. He represented that the enterprise would expand outside Texas. That planned expansion was part of the reason the Patels kept Immunogenomics independent and available to support operations across multiple states.

42. Sek further represented that part of CT Healthcare's investment would be applied to reduce Total MD's approximately $15 million debt to Alignment Credit, a New York lender. The debt and its carrying cost affected the company's financial condition and the value of CT Healthcare's proposed interest.

43. These statements were not merely generalized optimism. They identified concrete uses of the capital CT Healthcare was being asked to provide: deleveraging, rebranding, marketing, and geographic expansion. Sek presented those plans as the present intended use of CT Healthcare's money and as part of the economic rationale for the investment.

**E. The Austin Negotiations and Agreed Entry Valuation**

44. The parties continued negotiations in Austin after the August 30 presentation. Sek remained Total MD's principal negotiator.

45. The parties discussed the relationship between CT Healthcare's contribution and the percentage interest it would receive. The Patels did not agree to pay $4 million for four percent of a $100 million company. Instead, they negotiated an entry valuation of $50 million so that $4 million would purchase eight percent of Total MD.

46. The $50 million figure was the negotiated entry valuation. Sek did not retract his representations that Total MD had received $100 million offers or that he believed its actual value was closer to $200 million. To the contrary, the structure conveyed that CT Healthcare was being allowed to enter at a materially favorable valuation because the Patels would bring laboratory capabilities, expertise, and growth opportunities to the relationship.

47. Sek also represented that CT Healthcare's interest could increase to ten percent if the ImmuGlow opportunity were brought into the relationship. The ImmuGlow opportunity was discussed as another growth source for Total MD and the laboratory relationship.

48. On September 7, 2024, Sek sent a contemporaneous email summarizing deal points.

**F. CT Healthcare Relies and Purchases Total MD Class A Units**

49. CT Healthcare relied on Sek's valuation, offer, growth, and use-of-proceeds representations in deciding to purchase the Total MD interest. Chirag Patel and Twinkle Patel would not have caused CT Healthcare to invest $4 million on the agreed terms had they known that the purported $100 million offers were not bona fide, that the represented growth program would not be implemented, or that the investment would not be used as represented to reduce debt and develop the enterprise.

50. On September 27, 2024, CT Healthcare and Total MD executed a Subscription Agreement. Exhibit 4. Total MD agreed to issue Class A Units to CT Healthcare in exchange for the investment amounts stated in Schedule 1. Exhibit 4, § 1 & sched. 1.

51. Schedule 1 contemplated two four-percent purchases of Class A Units. The completed transaction resulted in CT Healthcare holding eight percent of Total MD. The parties later expressly described the interest as an eight-percent membership interest. Exhibit 8, § 1.

52. CT Healthcare funded approximately $2 million near the end of September 2024. It funded approximately another $2 million on or about November 1, 2024. The total investment was approximately $4 million.

53. The Subscription Agreement required CT Healthcare to execute a joinder to Total MD's Company Agreement. The Joinder Agreement admitted CT Healthcare as a member "for all purposes" with "all the rights incidental thereto." Exhibit 5.

54. On November 1, 2024, Total MD and CT Healthcare also executed an amendment to the Subscription Agreement. Exhibit 7. Section 1.0 required Total MD to provide quarterly and annual financial reports, reported monthly, plus other pertinent information CT Healthcare reasonably requested concerning Total MD and TMPG. That information right was part of the protection CT Healthcare required before completing its investment.

55. Sek confirmed the parties' mutual expectation of financial visibility in a November 1, 2024 email. He stated that he wanted visibility into the laboratory financials "just as we will share with you all - mutually," and he sent the Joinder and Amendment for execution. That contemporaneous statement confirms that financial transparency was part of the investment relationship.

**G. The Class A Units Are Securities**

56. The Class A Units were "securities" under the Securities Exchange Act and the Texas Securities Act. CT Healthcare invested money in a common enterprise and expected

profits and appreciation predominantly from the entrepreneurial and managerial efforts of Sek and Total MD. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477–83 (5th Cir. 1974).

57. CT Healthcare held only an eight-percent minority interest. Sek remained the sole or controlling manager. He controlled Total MD's operations, business strategy, finances, records, banking, related-party relationships, and the implementation of the growth plan that he had pitched to CT Healthcare.

58. CT Healthcare's contractual information and minority voting rights did not give it practical control over the enterprise. The Fifth Circuit looks to economic reality and whether investors are dependent on the promoter's essential managerial efforts. *Williamson v. Tucker*, 645 F.2d 404, 418–24 (5th Cir. 1981). LLC ownership interests can constitute investment contracts when the investors depend on others to manage the enterprise. *Affco Invs. 2001, L.L.C. v. KPMG, L.L.P.*, 625 F.3d 185, 190–93 (5th Cir. 2010).

59. The interests also fall within the Texas Securities Act's broad definition of a security, which includes shares, stock, subscription interests, and investment contracts. TEX. GOV'T CODE § 4001.068.

**H. The Represented Uses of Proceeds Did Not Occur**

60. After CT Healthcare funded the investment, Total MD did not carry out the principal uses of proceeds Sek had represented.

61. Total MD did not rebrand its Total Men's locations as Total Healthcare within the represented period. As of the client's September 2026 review, no location had been rebranded as represented.

62. Total MD did not open the represented additional locations or implement the represented multi-state expansion.

63. Total MD did not use CT Healthcare's investment as represented to reduce the Alignment Credit debt. The debt that Sek described as approximately $15 million grew to approximately $17 million.

64. After CT Healthcare completed the investment, Sek also refused to expand ImmuGlow through Total MD's clinics as discussed during the investment negotiations. Total MD instead treated ImmuGlow as a vendor for a period, generating approximately $100,000 per month for ImmuGlow, and Sek later caused the business to bypass ImmuGlow and work directly through another provider without obtaining the Patels' consent.

65. The complete failure of each identified use-of-proceeds plan, the increase rather than reduction of the Alignment debt, the prompt reversal on the ImmuGlow growth opportunity, and Sek's sole control over the relevant decisions support a strong inference that the statements described a plan Sek did not intend to implement when he solicited CT Healthcare's investment.

**I. Sek and Total MD Withhold the Financial Information Needed to Trace the Investment**

66. After CT Healthcare invested, Defendants did not provide the transparent, retainable financial information CT Healthcare had required and that Total MD agreed to provide.

67. Twinkle Patel requested first- and second-quarter profit-and-loss information and view-only clinic-side payroll access. Exhibit 9. Sek responded: "You're not privy to payroll data on Clinc side." When Twinkle asked how she was supposed to understand her eight-percent interest, Sek did not provide the requested records. Exhibit 9.

68. On May 23, 2025, Sek transmitted what he described as Total MD's 2024 profit-and-loss statement through Gmail confidential mode. Twinkle immediately requested downloadable copies and payroll reports for Total MD and TMPG. The confidential-mode transmission did not give CT Healthcare a durable copy of the recurring reports contemplated by the investment documents. Exhibit 14; Exhibit 1.

69. The access problem continued after the MSA. On March 28, 2026, Sek transmitted an email titled "CONFIDENTIAL – Total MD 2025, Q4 – Company Financials" through Gmail confidential mode. When Twinkle attempted to access it, Google displayed: "You don't have access to this email." Exhibit 15; Exhibit 1.

70. Defendants' information control is probative of scienter and loss causation because Sek possessed the financial records that would show how CT Healthcare's money was used, whether the represented debt reduction occurred, whether proceeds went to rebranding or expansion, and whether funds were instead transferred to insiders, affiliates, or other purposes.

**J. Independent Management Evidence Confirms Persistent Financial-Reporting Problems**

71. John Peskuski worked for Total MD, LLC for approximately seven years. He served as Regional Director for the DFW region for approximately five years and later became Vice President of Operations with responsibility for multiple regions. Exhibit 2, ¶¶ 2–3.

72. Peskuski states that, despite his senior operational responsibilities, management did not provide him full financial transparency. He repeatedly requested meaningful financial information but was not given what he regarded as "full or reliable underlying financial records." Exhibit 2, ¶ 4.

73. Peskuski knew the revenue-generating operations. He states that "the financial picture being presented to me did not make sense." Profit-and-loss materials and other summaries did not align with the revenues he understood the business was generating. Exhibit 2, ¶¶ 5–7.

74. Peskuski also observed mismatches between EHR and billing records and later reports. Access to billing, EOB, and related information was restricted. An offshore team in the Philippines handled billing-related data affecting downstream reports, and the reports supplied to management did not consistently align with the underlying operational and billing information. Exhibit 2, ¶¶ 8–10.

75. By late 2025, Peskuski had "lost trust and confidence in Robert Sek's management of the business." He resigned after repeated unsuccessful efforts to obtain transparent financial information and address operational and compliance concerns. Exhibit 2, ¶¶ 15–17.

76. Peskuski ultimately states that he does "not believe the company's internal reporting could be relied upon to accurately reflect its revenues, collections, expenses, and transfers." He further states that management did not provide enough information to determine "the disposition of company funds" and that the problems were "ongoing issues affecting the company's operations and finances, not isolated events." Exhibit 2, ¶¶ 18–20.

**K. The Economic Loss and Materialization of the Concealed Risk**

77. CT Healthcare paid approximately $4 million for a private, illiquid eight-percent interest in reliance on Sek's representation of existing value, third-party demand, growth plans, and use of proceeds.

78. The risks concealed or misstated in the investment pitch materialized. The represented deleveraging did not occur. The Alignment debt increased. The represented rebranding and location expansion did not occur. The business did not produce the growth path represented to CT Healthcare. CT Healthcare instead encountered persistent financial opacity and could not verify the disposition of the capital it supplied.

79. The absence of the represented growth, the increase in secured debt, the later discovery of substantial creditor claims and a $1.9 million federal tax lien, and Defendants' inability or refusal to complete the agreed MSA buyback all impaired the value and liquidity of CT Healthcare's interest. Exhibit 10; Exhibit 11.

80. CT Healthcare's loss is not merely the difference between a represented purchase price and an inflated price on the date of purchase. CT Healthcare alleges that the misrepresented and concealed conditions caused the investment to lose value when the promised capital

deployment failed, leverage increased, financial liabilities materialized, and the company failed to generate the represented expansion and value. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–47 (2005).

81. The precise amount of securities-law damages will be proved through financial records, valuation evidence, tracing of the investment proceeds, and expert testimony. CT Healthcare pleads facts plausibly connecting the alleged fraud to its economic loss. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255–58 (5th Cir. 2009).

**L. The Mediated Settlement Agreement Preserves CT Healthcare's Ownership**

82. The securities fraud did not end CT Healthcare's ownership. In December 2025, CT Healthcare, Sek, Total MD, TMPG, FHIR IT, LLC, Chirag Patel, and Twinkle Patel participated in mediation in Houston concerning the parties' broader disputes.

83. The parties and their counsel signed the MSA. Exhibit 8. The agreement states that the parties reviewed it, had an opportunity to request changes, signed voluntarily, and relied on their own understanding and counsel.

84. The MSA required Sek to purchase CT Healthcare's eight-percent membership interest. It did not immediately transfer CT Healthcare's interest. Instead, CT Healthcare would continue to hold the equity, with all member rights and responsibilities, as security until Defendants completed the payment obligations. Exhibit 8, § 1.

85. The MSA's handwritten payment schedule included $1,628,000 from Sek to CT Healthcare by February 2, 2026, quarterly installments beginning March 1, 2026, and a final installment. Exhibit 8, § 2. The agreement also included a separate payment to FHIR IT that is not sought by CT Healthcare in this action.

86. The MSA accelerates remaining payments upon a sale of Total MD or TMPG or a change of control. It also provides interest on late payments. Exhibit 8, §§ 3, 9.

87. Sek signed the MSA individually and for Total MD. Paragraph 5 states that Sek "will personally guarantee any and all payment obligations contained herein." Exhibit 8, § 5.

88. The MSA states that it is binding and enforceable. It contemplates further mediation of disputes about the MSA or a later formal settlement document but expressly states that the MSA itself is enforceable. Exhibit 8, § 7. A signed Rule 11 settlement is enforceable as a contract when its material terms are definite. *Padilla v. LaFrance*, 907 S.W.2d 454, 460–61 (Tex. 1995); *Mantas v. Fifth Ct. of Appeals*, 925 S.W.2d 656, 658–59 (Tex. 1996) (orig. proceeding).

89. CT Healthcare performed or tendered the payment instructions required from it. On February 17, 2026, Chirag Patel transmitted wire instructions to counsel for delivery to Sek and requested notice of default. Corrected routing information was supplied on February 20, 2026. Exhibit 13.

90. Sek did not timely pay the $1,628,000 due to CT Healthcare on February 2, 2026. Defendants also failed to make later required installments. They have not completed the purchase of CT Healthcare's equity.

91. CT Healthcare therefore remains an eight-percent owner of Total MD and continues to hold the interest as security for the unpaid MSA consideration.

**M. Current Liens, Records, and Threat to the Investment**

92. On May 5, 2025, the Internal Revenue Service filed a tax lien against Total MD in the approximate amount of $1.9 million for tax periods that include 2020, 2021, and 2024. Exhibit 10.

93. At least three UCC filings identify security interests affecting Total MD assets. Wilmot Plaza, LLC and DAL Investments claim liens on property at identified clinic locations. Alignment Debt Holdings 1, LLC claims a security interest broadly covering Total MD's personal property and proceeds. Exhibit 11.

94. Sek remains in control of Total MD's financial accounts, records, banking relationships, payment systems, and internal reporting. CT Healthcare remains unable to verify the company's financial condition or trace the complete disposition of the money it invested.

95. The risk is not adequately addressed by a damages award alone. CT Healthcare continues to own a unique minority interest. The MSA uses that interest as security. The value of the interest depends on the preservation of Total MD's assets, records, and ownership structure. Destruction of audit trails or transfer of the equity or traceable property would impair relief that cannot later be reconstructed with certainty.

## VI. HEIGHTENED SECURITIES-FRAUD ALLEGATIONS

### A. Particularity Under Rule 9(b) and the PSLRA

96. CT Healthcare pleads the federal securities claim with the particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). The complaint identifies the speaker, the content of the challenged statements, when and where they were made, why they were material, why CT Healthcare alleges they were false or misleading, and the facts supporting scienter. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362–65 (5th Cir. 2004).

97. The principal speaker was Sek. The central presentation occurred by Zoom on August 30, 2024. The participants were Chirag Patel, Twinkle Patel, Sek, Wasi Khan, and Rikin Shah. Sek led the presentation and made the challenged valuation, offer, growth, and use-of-proceeds statements.

98. The statements were made before CT Healthcare purchased the Class A Units and were designed to induce that purchase. They were followed by in-person negotiations in Austin, a September 7, 2024 deal-summary email from Sek, the September 27 Subscription Agreement,

the first approximately $2 million closing, and the second approximately $2 million closing on or about November 1, 2024.

**B. Strong Inference of Scienter**

99. Sek knew the truth about the supposed third-party offers because he personally displayed and described them. He knew whether Total MD had received bona fide $100 million offers and whether those documents represented actual executable or credible purchase proposals. There is no innocent-information-gap explanation for a false statement about offers that Sek himself claimed to possess.

100. Sek also knew how he intended to use CT Healthcare's money because he personally controlled Total MD and personally described the purposes of the investment. He knew the status of the Alignment debt and controlled whether Total MD would use CT Healthcare's funds to reduce it.

101. The subsequent conduct supplies particularized circumstantial evidence of intent. None of the principal represented uses occurred. Total MD did not rebrand. It did not undertake the represented location expansion. It did not reduce the Alignment debt with CT Healthcare's investment. The debt increased. Sek also refused to implement the represented ImmuGlow expansion after the investment closed.

102. The inference of fraudulent intent is strengthened by Defendants' subsequent refusal to provide complete, retainable financial information showing where the money went. Sek controlled the records. Senior operational management separately encountered financial reports that did not align with observed revenue and could not obtain the underlying records needed to reconcile the discrepancy. Exhibit 2, ¶¶ 4–10, 18–20.

103. Taken collectively, these facts support an inference that Sek intended to induce CT Healthcare to supply capital through materially false or misleading statements about existing value, supposed third-party offers, and the intended use of CT Healthcare's money. That

inference is cogent and at least as compelling as the competing inference that every identified plan independently failed only after a good-faith change in business circumstances. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007).

104. At minimum, the facts support severe recklessness. In the Fifth Circuit, severe recklessness means highly unreasonable conduct involving an extreme departure from ordinary care that presents a danger of misleading investors either known to the defendant or so obvious the defendant must have been aware of it. *Nathenson*, 267 F.3d at 408.

## VII. CLAIMS FOR RELIEF

### Count One - Violation of Section 10(b) and Rule 10b-5 Against Sek and Total MD

105. CT Healthcare incorporates the preceding allegations.

106. Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibit deceptive devices and material misstatements or omissions in connection with the purchase or sale of a security.

107. A private Rule 10b-5 plaintiff must prove a material misrepresentation or omission, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation. *Janus*, 564 U.S. at 140 n.3; *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

108. CT Healthcare purchased securities when it acquired the Total MD Class A Units. The transaction satisfies Howey and controlling Fifth Circuit authority because CT Healthcare invested money in a common enterprise and depended predominantly on Sek and Total MD's essential managerial efforts. *Howey*, 328 U.S. at 298–99; *Koscot*, 497 F.2d at 477–83; *Affco*, 625 F.3d at 190–93.

109. Sek made material false or misleading statements concerning Total MD's existing valuation, supposed bona fide $100 million written offers, and the intended use of CT Healthcare's $4 million for deleveraging, rebranding, marketing, and expansion. Total MD is

directly liable for statements Sek made with ultimate authority while acting as its chief executive, manager, and investment solicitor. *See Southland*, 365 F.3d at 366–67.

110. The statements were material because a reasonable investor deciding whether to purchase an illiquid minority interest would consider the issuer's existing value, actual third-party demand, leverage, intended capital deployment, and growth plan important to the investment decision. *Basic*, 485 U.S. at 231–32.

111. Sek acted with scienter for the reasons pleaded with particularity above. He knew the truth about the purported offers and Total MD's actual financial condition. He controlled the intended use of proceeds. The complete nonperformance of the represented uses, increase in debt, prompt reversal of key growth plans, and financial opacity support a strong inference of intent or severe recklessness. *Tellabs*, 551 U.S. at 323–24; *Nathenson*, 267 F.3d at 408, 412.

112. The fraud was connected to CT Healthcare's purchase. Sek made the statements to induce CT Healthcare to buy Total MD Class A Units. The Subscription Agreement and the two closings followed the solicitation. Sek and Total MD used instrumentalities of interstate commerce, including Zoom, email, and interstate banking and wire-transfer systems, to solicit, document, and consummate the purchases.

113. CT Healthcare actually and reasonably relied on the statements. This was a private negotiated transaction, not a fraud-on-the-market case. Chirag Patel and Twinkle Patel heard Sek's representations directly and caused CT Healthcare to invest in reliance on them.

114. CT Healthcare suffered economic loss caused by the fraud. The capital was not deployed as represented. Leverage increased rather than decreased. The represented growth did not occur. The company's financial condition and liabilities impaired the value and liquidity of CT Healthcare's interest. Defendants' later MSA default further impaired CT Healthcare's ability to realize the represented investment value. *Dura*, 544 U.S. at 342–47; *Lormand*, 565 F.3d at 255–58.

115. CT Healthcare seeks all damages recoverable under section 10(b), together with prejudgment and postjudgment interest and costs. CT Healthcare will prove the amount through tracing, valuation, and expert evidence.

**Count Two - Section 20(a) Controlling-Person Liability Against Sek**

116. CT Healthcare incorporates the preceding allegations.

117. Section 20(a) makes a person who directly or indirectly controls a person liable under the Exchange Act jointly and severally liable to the same extent, subject to the statutory good-faith defense. 15 U.S.C. § 78t(a).

118. Sek controlled Total MD. He was its chief executive and sole or controlling manager. He possessed the power to direct its management and policies, negotiated CT Healthcare's investment, made the challenged statements, executed the investment documents, and controlled the use of investment proceeds.

119. The Fifth Circuit defines control as the direct or indirect power to direct or cause the direction of management and policies. *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957–58 (5th Cir. 1981). Sek's authority exceeds that standard.

120. To the extent any primary Rule 10b-5 violation is attributed to Total MD rather than Sek directly, Sek is jointly and severally liable as Total MD's controlling person under section 20(a).

**Count Three - Texas Securities Act Seller Liability Against Total MD and Controlling-Person Liability Against Sek**

121. CT Healthcare incorporates the preceding allegations.

122. Texas Government Code § 4008.052(a) imposes liability on a person who offers or sells a security, from whom the buyer purchases, when the security is sold by means of an untrue statement of material fact or an omission necessary to make the statements made not misleading.

123. Total MD was the issuer and direct seller of the Class A Units. CT Healthcare bought the Units from Total MD under the Subscription Agreement. Exhibit 4.

124. Total MD, through Sek, sold the Units by means of the materially false or misleading valuation, offer, growth, and use-of-proceeds statements pleaded above.

125. Unlike Rule 10b-5, primary seller liability under the Texas Securities Act does not require CT Healthcare to prove scienter or common-law reliance. *Wood v. Combustion Eng'g, Inc.*, 643 F.2d 339, 345–46 (5th Cir. 1981); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343–44 (5th Cir. 2008). The statute places the reasonable-care defense on the seller. TEX. GOV'T CODE § 4008.052(c).

126. Sek is jointly and severally liable as a controlling person under Texas Government Code § 4008.055(a). He directly controlled Total MD and personally directed the offering and sale. The Texas Supreme Court recognizes the Act's distinct primary and control-person liability structure and the controlling person's statutory reasonable-care defense. *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 839–42 (Tex. 2005).

127. CT Healthcare still owns the eight-percent security. It therefore pleads rescission under Texas Government Code §§ 4008.052(b)(1) and 4008.056 in the alternative to enforcement of the MSA. If rescission is elected, CT Healthcare offers to tender the Total MD Units upon entry of relief and seeks return of the statutory consideration, legal interest, and other adjustments allowed by § 4008.056.

128. If CT Healthcare is determined no longer to own the security when judgment is entered, it alternatively seeks the statutory damages available under Texas Government Code §§ 4008.052(b)(2) and 4008.057.

129. CT Healthcare pleads the Texas Securities Act remedy in the alternative. It will not obtain both rescission returning the purchase consideration and duplicative recovery of the same value through the MSA buyback.

**Count Four - Breach of the Mediated Settlement Agreement Against Sek and Total MD**

130. CT Healthcare incorporates the preceding allegations.

131. The MSA is a valid and enforceable written contract. TEX. CIV. PRAC. & REM. CODE § 154.071(a); *Padilla*, 907 S.W.2d at 460–61.

132. CT Healthcare is a party and promisee. Sek and Total MD are parties and obligors. CT Healthcare performed, tendered performance, or was excused from further performance.

133. Sek materially breached the MSA by failing to pay $1,628,000 by February 2, 2026, failing to make later amounts for which he is responsible, and failing to complete the purchase of CT Healthcare's equity.

134. Total MD materially breached the MSA by failing to perform the payment obligations assigned to it and by failing to complete the agreed settlement performance.

135. CT Healthcare seeks all matured installments and any remaining amounts that become due through a proved contractual acceleration event, anticipatory repudiation, or other lawful basis. It also seeks contractual interest and recoverable attorney's fees.

**Count Five - Enforcement of Sek's Written Guaranty**

136. CT Healthcare incorporates the preceding allegations.

137. Paragraph 5 of the MSA contains Sek's written guaranty: "SEK will personally guarantee any and all payment obligations contained herein." Exhibit 8, § 5.

138. The guaranteed payment obligations matured and were not paid. Sek breached the written guaranty by failing to pay the guaranteed obligations after default.

139. CT Healthcare seeks judgment against Sek for all guaranteed amounts due to CT Healthcare, accrued interest, attorney's fees where recoverable, costs, and other relief allowed by law.

**Count Six - Declaratory Judgment Under 28 U.S.C. §§ 2201–2202**

140. CT Healthcare incorporates the preceding allegations.

141. An actual controversy exists concerning CT Healthcare's continuing ownership, the MSA's effect, the security status of the eight-percent interest, the enforceability and scope of Sek's guaranty, and the consequences of any sale or change of control.

142. CT Healthcare seeks declarations that it continues to own and hold its eight-percent membership interest until Defendants complete the MSA payment obligations; that it retains all member rights incident to that interest; that the interest remains security for the unpaid settlement consideration; that Defendants may not cancel, dilute, transfer, redeem, or encumber the interest contrary to the MSA; that Sek's written guaranty is enforceable; and that a proved sale or change of control triggers the MSA's acceleration provision.

143. CT Healthcare seeks declaratory relief under the federal Declaratory Judgment Act. It does not seek attorney's fees under the Texas Uniform Declaratory Judgments Act merely because the declaration is pursued in federal court. *See Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998).

**Count Seven - Breach of Fiduciary Duty Against Sek, Pleaded in the Alternative**

144. CT Healthcare incorporates the preceding allegations.

145. CT Healthcare remains an eight-percent member of Total MD. Total MD's Third Amended and Restated Company Agreement identifies Sek as the sole manager as of January 19, 2023 and defines fiduciary standards for managers, directors, and officers. Exhibit 6, §§ 3.01, 3.04, 4.04.

146. Sek exercised actual control over Total MD's finances, records, distributions, transactions, and affiliate relationships. To the extent the Company Agreement and applicable law impose fiduciary duties running directly to CT Healthcare concerning self-dealing, disclosure, and member rights, Sek owed those duties while CT Healthcare remained a member.

147. Sek breached any such direct duties by withholding material financial information, concealing or failing to account for related-party and personal-benefit transactions, using control for personal benefit, and impairing CT Healthcare's membership and MSA security rights.

148. CT Healthcare pleads this direct fiduciary claim in the alternative and only to the extent the injury is personal to CT Healthcare rather than belonging solely to Total MD. It seeks actual damages, equitable relief, disgorgement, and any forfeiture remedy supported by the governing law and proof.

**Count Eight - Derivative Breach of Fiduciary Duty on Behalf of Total MD, Pleaded in the Alternative**

149. CT Healthcare incorporates the preceding allegations.

150. To the extent Sek's alleged diversion, waste, self-dealing, or misuse of company assets primarily injured Total MD, CT Healthcare pleads a derivative claim on Total MD's behalf.

151. CT Healthcare owned its membership interest when the challenged conduct occurred and remains a member.

152. On information and belief, Total MD is a closely held limited liability company within Texas Business Organizations Code § 101.463 because it has fewer than 35 members and no membership interests listed on a national securities exchange or regularly quoted in an over-the-counter market. Sek is a present governing person and manager. Sections 101.452 through 101.460, including the statutory demand requirement in § 101.453, therefore do not apply to this derivative proceeding against Sek. TEX. BUS. ORGS. CODE § 101.463(a)–(b).

153. Federal Rule of Civil Procedure 23.1 does not create a substantive demand requirement. CT Healthcare pleads with particularity that no state-law demand is required under § 101.463 for this closely held LLC claim against its present governing person. Alternatively, if

the Court determines a demand is required, CT Healthcare requests leave to amend after compliance rather than dismissal with prejudice.

154. Sek breached duties owed to Total MD by using or permitting company-controlled assets for personal benefit, authorizing unsupported related-party transfers, failing to maintain transparent records, and failing to account for transactions under his control.

155. Total MD suffered injury to the extent company assets were diverted, misapplied, wasted, or transferred for less than fair value. CT Healthcare seeks recovery for Total MD, equitable tracing, disgorgement, an accounting, and any constructive trust supported by proof.

156. Total MD is a direct defendant on other claims and the entity for whose benefit this alternative derivative claim is asserted. CT Healthcare requests appropriate alignment and relief consistent with Federal Rule of Civil Procedure 23.1 and applicable state law.

**Count Nine - Equitable Accounting**

157. CT Healthcare incorporates the preceding allegations.

158. The financial transactions are unusually complex and controlled by Defendants. They involve management fees, medical-practice revenue, billing systems, depository and operating accounts, member capital, intercompany transfers, related-party payments, owner payments, debt service, and MSA payment obligations.

159. The necessary records are not available to CT Healthcare through ordinary information presently in its possession. Defendants control the bank statements, general ledgers, audit trails, billing reports, EOB information, tax records, related-party records, and transaction support.

160. CT Healthcare seeks an equitable accounting to the extent ordinary discovery and legal remedies prove inadequate. The accounting should identify MSA payments, funds received by Total MD from or for TMPG, management fees and expense reimbursements, loans and advances, payments to Sek or affiliates, capital-account entries, distributions, accounts holding

traceable proceeds, and transactions affecting CT Healthcare's interest or Defendants' ability to satisfy the MSA.

**Count Ten - Constructive Trust, Tracing, and Disgorgement Remedies**

161. CT Healthcare incorporates the preceding allegations.

162. To the extent Sek or another recipient possesses specifically identifiable property obtained through fiduciary breach, wrongful transfer, or misuse of company property, CT Healthcare seeks equitable tracing and a constructive trust over the property and its traceable proceeds.

163. Texas law requires identification of specific property or traceable proceeds before imposing a constructive trust. *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 872–73 (Tex. 2017). CT Healthcare does not seek a constructive trust over Defendants' general assets without tracing.

164. CT Healthcare also seeks disgorgement and forfeiture to the extent those equitable remedies are available for a proved fiduciary breach.

## VIII. REQUEST FOR APPOINTMENT OF RECEIVER UNDER FEDERAL RULE OF CIVIL PROCEDURE 66

### A. Governing Standard

165. Federal Rule of Civil Procedure 66 governs appointment and administration of a receiver in this Court. Receivership is an extraordinary equitable remedy that should be imposed only with caution and upon a clear showing of necessity. *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).

166. Relevant factors include the validity of the movant's claim, probability of fraudulent conduct that may frustrate the claim, imminent danger that property will be concealed, lost, diminished, or squandered, inadequacy of legal remedies, absence of a less drastic equitable

remedy, and whether a receiver will do more good than harm. *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241–42 (5th Cir. 1997).

**B. A Receiver Is Warranted If Lesser Relief Cannot Protect Total MD and CT Healthcare's Interest**

167. CT Healthcare remains an owner, not merely an unsecured creditor. Its eight-percent interest is current property and is expressly held as security under the MSA.

168. Sek controls Total MD's accounts, records, assets, and transaction information. CT Healthcare has not received the transparency necessary to monitor the company. Peskuski's independent testimony describes persistent inability even by senior management to reconcile reported finances with observed revenues and to determine the disposition of company funds.

169. The company is subject to significant liens and has defaulted on the MSA buyback. CT Healthcare alleges securities fraud concerning the very investment that created its ownership interest. These circumstances create a substantial risk that continued unilateral control by Sek will impair the property and records needed for effective relief.

170. CT Healthcare recognizes that receivership is more intrusive than an injunction. It therefore requests appointment only if the Court determines that preservation orders, expedited discovery, and a preliminary injunction will not adequately protect the company, the records, and CT Healthcare's interest.

171. If appointed, the receiver should have authority, subject to Court supervision, to secure Total MD's books and electronic records; obtain statements and records from banks and payment processors; preserve revenues and receivables; review insider and related-party transactions; report to the Court; and take ordinary actions necessary to preserve the company without interfering with clinical decision-making by TMPG.

## IX. CONDITIONS PRECEDENT

172. All conditions precedent to CT Healthcare's claims have occurred, have been performed, or have been waived.

173. CT Healthcare performed or tendered its obligations under the MSA, including supplying payment instructions. Defendants did not make the required payments.

174. To the extent the MSA requires further mediation concerning a dispute about the MSA, CT Healthcare alleges that the parties have participated in mediation concerning the relevant dispute, Defendants' continued nonpayment constitutes waiver or repudiation of any further condition, and in any event the clause does not prohibit provisional relief necessary to preserve property and records. CT Healthcare remains willing to participate in any further mediation the Court determines is required.

## X. ATTORNEY'S FEES, INTEREST, AND COSTS

175. CT Healthcare seeks reasonable and necessary attorney's fees on its Texas contract claim under Texas Civil Practice and Remedies Code § 38.001, to the extent all statutory prerequisites are satisfied, and under any other contract or statute that independently authorizes fees.

176. CT Healthcare does not seek fees under Texas Civil Practice and Remedies Code § 37.009 solely for federal declaratory relief. *See Utica Lloyd's*, 138 F.3d at 210.

177. CT Healthcare seeks contractual interest on late MSA payments, prejudgment interest as allowed by law, postjudgment interest under 28 U.S.C. § 1961, and taxable costs.

## XI. JURY DEMAND

178. CT Healthcare demands a jury trial on all issues triable to a jury under Federal Rule of Civil Procedure 38 and the Seventh Amendment.

## XII. PRAYER

CT Healthcare respectfully requests that Defendants be served and required to appear and answer and that the Court grant the following relief:

a. a temporary and preliminary injunctive relief as requested in Plaintiff's separately filed application;

b. expedited discovery and an early preliminary-injunction hearing as requested in that application;

c. damages recoverable under section 10(b) and Rule 10b-5;

d. joint and several controlling-person liability against Sek under section 20(a);

e. rescission under the Texas Securities Act while CT Healthcare owns the security, or statutory damages if it no longer owns the security, together with controlling-person liability against Sek;

f. judgment for all amounts due under the MSA and Sek's written guaranty;

g. declarations concerning CT Healthcare's continuing eight-percent ownership, security rights, the MSA, and Sek's guaranty;

h. actual damages and equitable monetary relief on any fiduciary claim proved;

i. derivative recovery for Total MD to the extent injury belongs to Total MD;

j. an equitable accounting to the extent necessary;

k. a constructive trust only over specifically identified and traceable property proved at trial;

l. disgorgement and forfeiture where authorized by law;

m. specific performance where appropriate;

n. a permanent injunction after trial;

o. appointment of a receiver if the Court finds lesser relief inadequate;

p. contractual, prejudgment, and postjudgment interest;

q. reasonable and necessary attorney's fees where independently authorized;

r. taxable costs; and

s. all other legal and equitable relief to which CT Healthcare is entitled, without double recovery.

Respectfully Submitted,

THE VETHAN LAW FIRM, PC
By: /s/ Charles MR Vethan
Charles M.R. Vethan
Texas Bar No. 007918520
1300 McGowen St Suite 100
Houston, Texas 77004
Telephone (713) 526-2222
Facsimile: (713) 526-2230
Email: edocs@vethanlaw.com
***Attorney for CT Healthcare Holdings LLC***

**VERIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23.1 AND 28 U.S.C. § 1746**

I, Twinkle Patel, declare under penalty of perjury that I am an authorized representative of CT Healthcare Holdings, LLC. I have reviewed the foregoing Original Complaint. The factual allegations stated from my personal knowledge are true and correct. The allegations stated on information and belief are believed to be true based on the records, communications, and information available to CT Healthcare after reasonable inquiry. I make this verification for purposes of Federal Rule of Civil Procedure 23.1 and 28 U.S.C. § 1746.

Executed on 22nd September, 2026, in Harris County, Texas.

Twinkle Patel

Twinkle Patel



Doc ID: fea7a5b0b0fcd369cdc2a6dda0447f1c66ff7573